## In the Matter of the Estate of LAURA A. LEONARD, Deceased.

Surrogate's Court, Tioga County, May 14, 1934.

*Andrews & Andrews,* for the trustee.

*J. S. Truman* and *Robert V. R. Bassett,* as executors, etc., of John G. Underhill, deceased.

*Truman, Bassett & Wood,* for the Owego National Bank, as substituted trustee.

*J. S. Truman* and *Benjamin Levy,* for the trustee in bankruptcy of H. Leonard Underhill.

TURK, S.   On the 7th day of August, 1922, the last will and testament of Laura A. Leonard, who died a resident of the county of Tioga, was admitted to probate in this court.   That will created a trust which was to take effect upon the death of Emily C. Leonard, a sister of the decedent, whose death occurred on the 18th day of June, 1925.   The portion of the will creating such trust is as follows: "All the balance and remainder of my estate and property, both real and personal, and of every kind, name and nature, and whether situated in the State of New York, or in any other State or Territory of the United States, which has not been hereinbefore disposed of by this my Will, I give, devise and bequeath unto H. Leonard Underhill, as Trustee, and in trust for and during the term of the natural life of Esther H. Winter; the said Trustee to collect the income and interest from all personal property, and the rents from all real estate and to turn the same over at least once in each year, to the said Esther H. Winter, for and during the term of her natural life.

" The trust hereby created for the benefit of the said Esther H. Winter, is to terminate upon the death of the said Esther H. Winter, and all of said trust estate and property so held by said Trustee for the benefit of the said Esther H. Winter, is, upon the death of the said Esther H. Winter, to become the absolute property of her Sons, H. Leonard Underhill and John G. Underhill, Jr., equally, share and share alike, the same to be theirs absolutely and forever."

The will further provided that this trustee should not be required to give any bond or security of any kind in order to act as such

trustee, and it further provided as follows: " Nor shall he be liable for any loss which may be incurred by him as such Trustee, except such as may occur by reason of his wilful default or neglect."

After the death of Emily C. Leonard, which occurred on the 19th day of June, 1925, H. Leonard Underhill duly qualified as trustee and took over the duties of that office. On March 5, 1930, the said trustee made an intermediate account, which was judicially settled and allowed on the 14th day of March, 1930. From his accounting at that time it appeared that he had in his hands as principal of said trust fund, securities and cash in the amount of $136,679.06. This amount is not quite accurate, however, because he included in that total " Interest in Hermon C. Leonard estate," which was estimated at $75,580.

On the 17th day of January, 1934, the trustee filed a petition in this court alleging that for more than a year last past he had been hopelessly insolvent; that on the 8th day of February, 1933, he had made a voluntary petition in bankruptcy, had been adjudged a bankrupt, that a trustee had been appointed of his property, and in said petition he asked permission of this court to resign as trustee under the will of said Laura A. Leonard. On the 17th day of January, 1934, an order was made by this court permitting the resignation and directing the removal of H. Leonard Underhill as said trustee. That order also appointed the Owego National Bank of Owego, N. Y., as substituted trustee. This proceeding is the accounting made by the resigning trustee. From the account filed and from the testimony taken in this proceeding, three things stand out and are beyond dispute:

*First.* That the trustee has willfully appropriated to his own use securities belonging to the said estate.

*Second.* That the trustee has invested funds in his charge as such trustee and belonging to the said estate, in securities which were illegal as trust investments, and unauthorized under the most liberal construction which could be given to the rather broad powers contained in the will.

*Third.* That this trustee, acting with the executors of the estate of John G. Underhill and the life beneficiary under this will, Esther H. Winter, has attempted to terminate this trust contrary to the expressed provisions of the will.

I shall discuss these three points in their order.

On January 1, 1930, the trustee had in his hands securities valued at $58,789.15. Certain of these securities were sold for which the trustee received $14,425.18. Apparently from the moneys secured from the sale of these securities the trustee purchased additional securities for the trust in the amount of $14,234.82 none of which

has been sold for the benefit of the trust, so that the trustee should now have in his hands as such trustee securities in the amount of $58,598.79 less actual depreciation. It appears, however, from the accounting and the testimony taken that the trustee has not a single security left in his hands at the present time, but that securities which were valued on December 31, 1929, or cost if purchased since, amounting to $23,350 have been transferred by the trustee to the executors of the John G. Underhill estate, and that the balance of the securities which the trustee should have in his hands at this time, according to the trustee's testimony taken in this proceeding, have been "lost in speculation" and that the trustee has not at the present time a single security and has not a cent of money representing those securities. The securities which the trustee claims to have "lost in speculation" were not lost in speculating for the trust fund, but were placed in various personal trading accounts which the trustee had with various brokers, and were pledged to protect his own personal margin accounts. The amount of the securities used by the trustee for his own personal use was $35,131.25. It seems to be agreed, however, that those bonds had depreciated and that under the terms of the will the trustee should not be charged with the depreciation. The undisputed amount of that depreciation was $7,331.25, so that there can be no doubt but that the trustee owes this trust fund $27,800, plus an item of $1,066.26 in cash which he also took for his own use, or $28,866.26.

It was the duty of the trustee to keep the trust funds invested and he might by statutory authority, without risk to himself, make certain investments. (Pers. Prop. Law, § 21.) Beyond that, in making investments he was held to the duty to be faithful, diligent and prudent in an administration intrusted to him in confidence in his fidelity, diligence and prudence. In *King* v. *Talbot* (40 N. Y. 76) Judge WOODRUFF, in discussing the subject of diligence and prudence in the care and management of a trust fund, defined diligence and prudence as such care and management as prudent men of discretion and intelligence in such matters employed in their own like affairs, and he said: " This necessarily excludes all speculation, all investments for an uncertain and doubtful rise in the market, and, of course, everything that does not take into view the nature and object of the trust, and the consequences of a mistake in the selection of the investment to be made." He further said: " It, therefore, does not follow, that, because prudent men may, and often do, conduct their own affairs with the hope of growing rich, and therein take the hazard of adventures which they deem hopeful, trustees may do the same; the preservation of the

fund, and the procurement of a just income therefrom, are primary objects of the creation of the trust itself."

This trustee, on April 9, 1930, purchased 100 shares of " Stone & Webster, Inc., common stock," paying therefor $11,000, which he says in his testimony he knew at the time was not a legal investment. It seems to be agreed that the value of that stock is only $800. The trustee should, therefore, be charged with $10,300 because of his speculative investment. On November 30, 1933, there was an attempt made to terminate this trust, for on that day, as stated in the account of the trustee, he transferred to the executors of John G. Underhill, deceased, securities which cost or which were valued on December 31, 1929, the date of his last accounting, at $23,350, but which were valued at the time of the transfer at $9,800. He also, on the same day, transferred to the executors of John G. Underhill, deceased, cash in the amount of $800, making a total of $10,600. This was done not only at the request of the executors of John G. Underhill, deceased, but with the consent of the life beneficiary, Esther H. Winter. This attempt, however, to terminate the trust would have the effect of nullifying the will that created this trust. The will provides that " The trust hereby created for the benefit of the said Esther H. Winter is to terminate upon the death of the said Esther H. Winter." No act of the *cestui que trust* or the trustee or the surrogate or all combined can terminate a legal trust created for a legal period until the expiration of the time set by the testator. (*Metcalfe* v. *Union Trust Co.*, 181 N. Y. 39.) Courts of Chancery and other equity tribunals have exercised a supervisory power over the management of trust estates and the conduct of trustees, but they have never, except in exceptional cases, asserted the power to dissolve a trust before the expiration of the term for which it was created. The exceptions have been rare and have always belonged to a well-defined class where the interference of the court did not disturb or destroy the trust scheme but was rendered necessary in order to prevent its failure. (*Cuthbert* v. *Chauvet*, 136 N. Y. 326.) In *Lent* v. *Howard* (89 N. Y. 169), where all the persons interested were *sui juris* and all united in asking that the trust be extinguished, Chief Judge ANDREWS, in reversing the lower court, said: " The principle that the courts may destroy trusts for support and maintenance is sanctioned by the judgment in this case, and the judgment is also for this reason erroneous." In *Douglas* v. *Cruger* (80 N. Y. 15) the court said: " The Supreme Court has not the power to destroy a valid trust." If they could be rendered alienable by order of the court the whole scheme of the will would be disturbed and its purpose thwarted. In *Matter of Wentworth*

(230 N. Y. 176) Chief Judge Hiscock said: " The purpose of the testatrix was to create a trust for the support and maintenance during the life of a relative to whom * * * she could not make a devise of the principal. The purpose of the statute as has been stated over and over again was to permit a testator thus to make secure provision for the support and maintenance of an improvident person for life and to place it beyond the reach of said person or his creditors to defeat the purposes of the trust by alienating and squandering the principal."

The trustee in bankruptcy is the only person who is objecting to the account of the resigning trustee, with the exception of the executors of the estate of John G. Underhill, who object only to the stock purchased, and it is contended by the resigning trustee that the trustee in bankruptcy has not sufficient interest in the estate, or, using his language: " Is in no position to ask that the accounting trustee be required to reimburse the trust estate for any funds theretofore taken or lost." I cannot follow the reasoning of the resigning trustee in that respect, and I am convinced that it is not only the privilege but the duty of the trustee in bankruptcy to attempt to preserve this estate for the benefit of the individual creditors of Hermon Leonard Underhill. If, however, there was no appearance by the trustee in bankruptcy, and if no one objected to the attempt made to terminate the trust, I feel that it is the duty of the court to see that the terms of the will of Laura A. Leonard are carried out in so far as it is possible to do so. It follows, then, that the property which has been taken by the trustee must be restored to the Laura A. Leonard estate, the property which the executors of the John G. Underhill estate have taken must also be restored to this estate, and the accounting trustee must be surcharged with all loss which the estate has suffered by reason of the purchase of shares of stock of Stone & Webster, Inc.

It is doubtful if any criminal intent can be ascribed to the accounting trustee. He became involved in a series of personal losses due to the financial crisis and secured the consent of the life beneficiary of this estate to use the securities as he saw fit. She has remained friendly throughout the entire transaction and bears no ill will toward him for anything that has occurred. It is because of this apparent lack of criminal intent that this court, while it thoroughly condemns the practices employed, feels that a decree should be made which will eventually restore this estate to as near normal condition as possible and which will provide an income for the life beneficiary but which will give the accounting trustee a fair and reasonable time to make restitution. A decree may, therefore, be made directing that the accounting trustee,

Hermon Leonard Underhill, restore to this estate by paying the same to the new trustee the amounts which have been found herein to have been appropriated by him to his own personal use and in addition thereto the difference between the amount paid for and the value of the speculative investment made by him referred to herein as the "Stone & Webster, Inc., stock." Inasmuch as it seems impossible for him to make immediate restitution, I deem it for the best interest of the estate that the decree provide that he shall be given ten years to make such restitution, provided, of course, that the trust has not terminated by the death of Esther H. Winter before that period expires.

In his accounting the trustee states, and it also appears in the testimony taken herein, that there will undoubtedly come to this estate from the estate of Hermon C. Leonard which has not been entirely administered, approximately $75,000, in which the trustee has a one-half interest subject to the interest of the life beneficiary. In the event the life beneficiary dies before complete restitution has been made by Hermon Leonard Underhill, it seems that his interest in this amount can be used to satisfy a considerable portion of the deficiency and this is an added reason why I feel inclined to give the accounting trustee a period of years in which to make restitution. During that period, however, the income for the benefit of the life beneficiary must be taken care of and the decree should provide that the said Hermon Leonard Underhill pay to the new trustee, annually, an amount equal to four per cent of the amount with which he is hereby charged, to be treated by the new trustee as income and paid over to the life beneficiary in accordance with the terms of the will.

The transfer made to and received by the executors of the estate of John G. Underhill being entirely without authority of law and in violation of the expressed terms of the trust, the decree must also provide that the new trustee as soon as practicable take such steps as are necessary to recover from the executors of the John G. Underhill estate all securities and cash transferred to them by this trustee, the income from which is also to be paid over to the life beneficiary according to the terms of this trust, and the decree should further provide that until all security and cash so transferred shall come into the hands of the new trustee, the trustee shall collect and receive annually from the executors of the John G. Underhill estate an amount equal to four per cent of the amount of securities and cash remaining in the hands of said executors, which amount is to be treated by the new trustee as income and paid over to the life beneficiary in accordance with the terms of the will.

Decree may be entered accordingly.