In the Matter of the Accounting of James S. Truman, as Sole Surviving Substituted Trustee under the Will of Laura A. Leonard, Deceased, Respondent. Hermon L. Underhill, Jr., as Executor of Esther H. L. Winter, Deceased, Appellant.

In the Matter of the Accounting of James S. Truman, as Sole Surviving Substituted Trustee under the Will of Emily C. Leonard, Deceased, Respondent. Hermon L. Underhill, Jr., as Executor of Esther H. L. Winter, Deceased, Appellant.

Third Department, March 9, 1955.

*Neil G. Harrison* for appellant.

*Lewis B. Parmerton* and *James S. Truman,* in person, for James S. Truman, as sole surviving substituted trustee, respondent.

BERGAN, J. The central legal personality in this attenuated controversy is Esther H. L. Winter, who died in 1953. The problems posed in the case must be viewed in the relation of her two sisters and her two sons. By their respective wills her sisters created testamentary life trusts for her benefit; both sons were equal remaindermen; and one of the sons was designated as trustee in each trust. The two wills were alike in these respects.

The will of one sister, Laura A. Leonard, was admitted to probate in Tioga County in 1922; the will of the other sister, Emily C. Leonard, who died three years later, was admitted to probate in 1925 in the same county.

One of the sons, John G. Underhill, had become heavily indebted on bank loans. The mother was liable on this indebtedness. She was a comaker on some of the paper held by banks; an indorser on other paper. This son died August 3, 1929. His estate was not able to pay the bank indebtedness then amounting to $32,000. The banks sought payment from Mrs. Winter who gave her own notes in substitution of those of her son. She made some payments on this indebtedness.

The other son, Hermon L. Underhill, was the trustee for the two trusts. For the year 1929, in which John G. Underhill died, the account filed by Hermon showed a principal in the Laura A. Leonard estate of $136,679.06; and in the Emily C. Leonard estate of $180,269.79. Over half of this ($167,000) on December 31, 1929, was in cash or securities in the possession of the trustee.

It was established in an earlier proceeding (*Matter of Leonard,* 151 Misc. 558), and abundantly demonstrated in this record, that during 1931 Hermon L. Underhill had lost nearly all the money and securities under his control in both trusts by speculation or by conversion to his own use. An account filed by him in 1934 showed that instead of $167,000 in his possession he had left only $28,213.51.

The estate of John G. Underhill, of course, had an interest in what had happened, since it would have a one-half interest in the remainder at Mrs. Winter's death; Hermon, the trustee who had diverted the trust property, had a similar and equal interest in it as a remainderman; and Mrs. Winter had an

interest, since the ability of the trusts to pay the benefits provided had thus been vitally impaired.

Upon this situation arising in 1931 all the interested parties took steps to prevent further losses in the trusts. The attorney for Mrs. Winter, William G. Ellis, and James S. Truman, as executor and the attorney for the John G. Underhill estate, received from the trustee in 1932 all the securities he then had left — in the value of $28,213.51. These securities were kept by the attorneys in a safe-deposit box until 1933, when upon consent of Mrs. Winter, they were turned over to the estate of John G. Underhill.

It is helpful in understanding this controversy to place oneself back in a situation to look at things as these lawyers might have done in 1932 when they received the securities from the trustee; that in transferring this property to the John G. Underhill estate they felt they were accelerating by agreement with the life beneficiary payment of a portion of the residuary to the John G. Underhill estate which Hermon L. Underhill had been able to accelerate for himself by diverting to his own uses the property of which he was trustee.

It would seem normal to think the beneficiary who had obligated herself to pay the bank indebtedness of the John G. Underhill estate would agree to this, since her personal liability to banks would begin at the point at which the capacity of her son's estate to pay ended.

These informal arrangements were irregular and impaired the trust structure; but they were not shocking. They constituted a pragmatic attempt at salvaging some of the corpus of the trusts already grossly deteriorated by the activities of the trustee.

When the trustee filed his final account in 1934 and asked permission to resign his office, the Surrogate had some decided views about what should be done. (*Matter of Leonard,* 151 Misc. 558, *supra.*) The arrangements for the transfer of property to the John G. Underhill estate were characterized as an attempt to terminate the trusts which the Surrogate regarded as invalid and beyond the power or right of the life beneficiary and the remainderman, acting together, to bring about (pp. 560, 562). The acts of the trustee, who had diverted the property to his own uses, were, of course, strongly criticized. The decrees entered in both estates implemented these views of the Surrogate in two directions.

The decrees first of all surcharged the trustee Hermon L. Underhill $113,127 and directed that he repay this sum to the successor trustee, the Owego National Bank, within ten years and to pay to the life beneficiary 4% interest on the amount surcharged until repaid. The trustee had, in 1933, been adjudicated a bankrupt.

Turning attention to the transfer of trust property to the John G. Underhill estate, the subject which largely concerns us here, the decrees directed that the successor trustee take necessary steps to recover the $28,213 in trust property which had been transferred to that estate; and directed that until the property be recovered the estate should pay 4% annually on the amount of property not recovered. It was further directed that if the life beneficiary died before the property taken from the trusts had been recovered, the balance due on the account should be charged against the residuary share of the John G. Underhill estate in each case.

Nothing was accomplished, or indeed attempted, by the Owego National Bank as successor trustee toward collecting from the John G. Underhill estate the property that the trustee was required by terms of the decrees to recover; nor was there any payment of interest made by the estate to the trusts; and in 1939 the Owego National Bank requested of the Surrogate permission to resign as trustee. Its account showed it had neither received nor paid out any moneys in connection with the trusts.

Mrs. Winter consented to the resignation and requested the appointment of a successor trustee, suggesting for this office Robert V. R. Bassett and James S. Truman. Mr. Truman, as it has been noted, was the executor and also the attorney in the John G. Underhill estate.

Since the case now before us turns upon the activities of Mr. Truman under the decrees entered in 1934 his additional association with the interested parties in the case ought to be noted. He was a stockholder, director and counsel of the Owego National Bank which became successor trustee in 1934; and before the bank resigned as trustee in 1939 he had become its president. He was also the owner of a small amount of stock in the First National Bank of Owego to which the John G. Underhill estate and Mrs. Winter were indebted; and he is rather remotely related to the widow of John G. Underhill, who, as distributee, had an interest in the remainder of the two trusts here under consideration.

The Surrogate in 1939 allowed the bank to resign as trustee of the two trusts and appointed Mr. Truman, one of the nominees of Mrs. Winter, as trustee jointly with Benjamin F. Levy, who continued to act as joint trustee until his death in 1947; and thereafter Mr. Truman continued to act as sole trustee of the two trusts.

It has been noticed that in the period between 1934 and its resignation in 1939 no attempt was made by the Owego National Bank, as trustee, to recover the corpus of the trust property which had gone to the John G. Underhill estate and no attempt made to collect the interest required to be collected for the benefit of the trust; nor was any such attempt made during the period when Mr. Truman and Mr. Levy acted as successor trustees; nor when Mr. Truman acted alone as trustee.

But shortly after their appointment in 1939 the two individual trustees began to receive income and payment of principal into the trusts from sources which had not yielded any return while Hermon L. Underhill was trustee; and there seems no question raised that as to this trust property, the beneficiary, Mrs. Winter, received all from the trusts while administered by Mr. Truman that she was entitled to receive.

Nor is there any point raised upon the appeal as it reaches us that the trustee failed to recover the principal of the trust property which went to the John G. Underhill estate; and it seems unquestioned that credit for the receipt of this property was duly reflected in paying the residuary interest to that estate; and, indeed, the decrees of 1934 required that such unrepaid portion of the principal be credited to the residuary interest of the estate. It seems clear, as far as the record before us discloses, that what was required by the 1934 decrees was done in this respect.

The question now argued by the executor of the estate of Mrs. Winter is that the surviving trustee James S. Truman ought to have taken the necessary steps to have collected from the John G. Underhill estate the interest at 4% on the $28,213.51 required to be paid to the trusts by the 1934 decrees from the time of the entry of the decrees until the death of the life beneficiary; and that his failure to collect the interest should result in his being surcharged the amount of such interest; or in the alternative that the amount of the interest be deducted from the share of the remainderman John G. Underhill.

The amount of this interest thus claimed is $20,978.31. The resulting surcharge or deduction, appellant, as executor of Mrs.

Winter's estate, asks be paid to him. The Surrogate declined to grant this relief and the executor appeals. The court also denied other relief in respect of the repayment of principal to the trusts which is not reviewed on the appeal.

The argument of the appellant seems to be that Mrs. Winter could not as a matter of law have waived the payment of interest provided by the 1934 decrees because this would be destructive of the trust purpose; and that the accounting trustee's interests were so adverse to the trusts in this matter that he ought not have allowed the payment of interest to be waived and ought not be permitted to rely on the beneficiary's waiver on his final accounting as trustee. As to the fact that Mrs. Winter waived the payment of interest there can be little doubt. The waiver is supported by abundant proof and was found by the Surrogate.

The position which Mr. Truman chose to occupy when he qualified as trustee in 1939 after the Owego National Bank had asked to be relieved was at once delicate, difficult and inconsistent; and it is a place he would have been well advised not to have accepted. The Surrogate had criticized the payment of the corpus of the trust fund to the estate of which Mr. Truman was executor and attorney; and had by summary direction told the new trustee to get it back or collect interest on it.

More than that, the very payment of corpus which was involved was one in which Mr. Truman had directly participated, acting in the interest of the estate in which he was executor, but against the interest of the trusts, as the court viewed those interests in 1934. The payment may very well have been received by him for the estate in utmost good faith with a sense of practical fairness to the estate and the trust, and especially the interests and purposes of the life beneficiary, but the Surrogate in 1934 took a strong view about its validity; and everyone in that proceeding, the contemporary trustee and any successor trustee, including Mr. Truman, was bound by the decrees of 1934.

Therefore, when Mr. Truman decided to qualify in 1939 as trustee with decrees outstanding requiring him to collect interest from the estate of which he was executor, he had no choice, in standing between the duties he owed to the trusts and the duties he owed to the estate, except try in good faith to obey the judicial decrees at the peril of surcharge.

We think he could not in any event be surcharged personally for the period before he became trustee in 1939 for two sufficient reasons: (a) he has not been shown to be personally responsible on the record before us for the administration of the trusts by

the Owego National Bank, even though he was a stockholder, director, counsel, and for a short time before the termination of its trusteeship, president of the bank; and (b) the bank accounted in 1939, and its account showing it had not collected interest in pursuance of the 1934 decrees having been passed by the Surrogate, with due notice to Mrs. Winter as life beneficiary, had become binding on her and upon her estate. Her appearance in the proceeding and her consent to the resignation of the trustee with an account showing a failure to collect the interest here in question and her suggestion for the appointment of successors would seem to bind her on the judicial result of the proceeding.

We turn, then, to the question whether after his appointment in 1939 Mr. Truman's position as trustee was so delicate, balanced against his adverse interest as executor under the requirements of the 1934 decrees, that he will not now be permitted to plead that the beneficiary waived the payment of interest by the estate, assuming her legal right to do so. Whether the court will take his plea of waiver depends upon the fairness of the general result to her and on the whole course of conduct followed by the trustee.

When we view the problem in that way we find ourselves thinking that while technically the trustee did not do what the decrees required him to do, he acted in good faith and served adequately and well the interests of Mrs. Winter as life beneficiary. We are not quite carried along by the inferences and charges of actual wrongdoing that make copious appearances in appellant's briefs and arguments.

Upon the fairness of the general result of Mrs. Winter as life beneficiary, we examine first the question of possibility of collection of interest from the John G. Underhill estate after Mr. Truman became a trustee — or before that — and we find that collection would not have been possible. The estate had only one asset of substance, its remainder share in these very trusts.

Judgment might have been obtained for the interest required to be collected under the 1934 decrees, and the remainder interest sold. But the record does not suggest this would have brought more than a nominal amount; the Hermon L. Underhill remainder interest, which because of the effect on other trust interests of his surviving his brother had a somewhat larger value, brought a relatively small amount when sold in the bankruptcy proceeding. Even then the purchase of it was made by a party

who seemed to have a special reason for buying it in the interest of Mrs. Winter's grandchildren.

It is suggested by appellant the claim might have been reduced to judgment and satisfied out of the estate of John G. Underhill after the remainder had become vested in that estate on Mrs. Winter's death. This amounts to an argument that a life beneficiary's interest is necessarily served by recovering something for the benefit of her estate when she is dead. We do not consider the trustee was required by the demands of good faith to do either of these things.

What he did do, however, brought to Mrs. Winter as life beneficiary amounts well in excess of the $20,978.13 interest now claimed, entirely aside from the payments of benefits to her when, after 1939, the trusts began to receive income from other sources. An amount in the neighborhood of $30,000 was realized from the sale of trust assets arising substantially all from the original $28,213.50 in trust property which had gone to the John G. Underhill estate.

The proceeds of these sales were used to liquidate the bank indebtedness of Mrs. Winter. It is said in rejoinder that the indebtedness was largely incurred by Mrs. Winter for the benefit of her son John G. Underhill during his lifetime and hence it seems to be argued by appellant that his debt was not the mother's debt also.

But it is undisputed she had mortgaged her real and personal property, which was at the hazard of enforcement of these debts if the banks had acted to collect them; and the notes she signed to help her son and her subsequent financing of these obligations by new notes and pledges of her property were as much her obligation to the banks as loans made for other kinds of personal or business purposes. No one argues that if the notes went unpaid they were not fully enforcible against Mrs. Winter and against her pledged property.

We discuss these circumstances at some length to correlate in proper position in the case our conclusion that Mr. Truman as trustee ought not to be prevented by the court from pleading waiver by Mrs. Winter of the failure of the trust to collect interest under the 1934 decrees from the John G. Underhill estate, however good or bad as a matter of law such a plea may be.

Finally, we think that the life beneficiary had the right to waive the payment of interest to the trust required by the 1934 decrees and that she did waive it and ratify the proceedings

of the trustee under beneficial circumstances which prevent her estate from now demanding payment. We do not discuss in detail the acts of ratification and waiver but they are fully demonstrated in the record.

Appellant relies on subdivision 1 of section 15 of the Personal Property Law, which terms prohibit the assignment of the right of a beneficiary to receive the income of personal property in a trust. It has been commonly held that while the beneficiary may not assign his right to receive income he may assign accrued income and may direct the payment of future income in a given way, the direction being treated as good until revoked. (*Matter of Oakley,* 116 Misc. 494, affd. 207 App. Div. 811; *Matter of Nunno,* 161 Misc. 707; *Matter of Kaufman,* 201 Misc. 905.) The rule was explained in *Heise* v. *Wells* (211 N. Y. 1).

If it be assumed that the payment of interest under the decrees of 1934 was a right created by a trust to receive income, since it was designed to become a substitute for such a right, the waiver of the right was after the interest had become due and it was a waiver, which in the light of the whole trustee-beneficiary relation, was consistent with the rights of the beneficiary.

The decision in *Matter of Wentworth* (230 N. Y. 176) is distinguishable. There the trustee derived a personal gain and the life beneficiary had no benefit in the questioned conduct. The court noted, among other things, that "not a dollar was realized for the benefit of the *cestui que trust*" and regarded the trustee's action as a "cover" for the "personal benefit" of the trustee to free the property from the trust (*supra,* p. 182).

Where a beneficiary has consented to an act or ratified it in the management of the trust, he is usually precluded from asserting that such an act is a breach of trust (*Butterfield* v. *Cowing,* 112 N. Y. 486). It may sometimes be regarded so inequitable to allow beneficiaries to escape the effect of their voluntary consents to the disposition of trust property in a certain way as to invoke an estoppel or its equivalent. (*Matter of Wells,* 282 App. Div. 432; see, also, *Woodbridge* v. *Bockes,* 170 N. Y. 596, 603; 2 Scott on Trusts, § 216.1.)

It is not a consideration controlling on the decision to be made, but we cannot fail to notice that if the trustee is surcharged, or if the amount of the claim of interest be allowed against the estate of John G. Underhill, potentially Hermon L. Underhill, who was the trustee during whose administration the dissipation of trust property occurred which gave rise to this controversy, could directly gain. Mrs. Winter's will creates

of all her estate, with a minor exception, a trust in which he is the life beneficiary. The trustee thereof has the power to apply both principal and income for the life beneficiary and could, of course, use the $20,978.31 for this purpose if it went to Mrs. Winter's estate. This is a possibility we think should be avoided; and it has been avoided by the decision of the Surrogate.

The decrees should be affirmed, with costs.

FOSTER, P. J., COON, IMRIE and ZELLER, JJ., concur.

Decrees affirmed, with costs.